Joseph W. Cotchett (SBN 36324)
Elizabeth T. Castillo (SBN 280502)
Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
jcotchett@cpmlegal.com
ecastillo@cpmlegal.com
azapala@cpmlegal.com

Kelly W. Weil (SBN 291398)
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd., Suite 3088
Santa Monica, CA 90405
Tel: (310) 392-2008
Fax: (310) 392-0111
kweil@cpmlegal.com

*Counsel for Plaintiffs Amy Jine, Ana Biocini, and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **AMY JINE** and **ANA BIOCINI**, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**OTA FRANCHISE CORPORATION**, a Nevada Corporation,<br><br>**NEWPORT EXCHANGE HOLDINGS, INC.**, a California corporation,<br><br>**NEH SERVICES, INC.**, a California corporation,<br><br>**EYAL SHAHAR**, individually and as an officer of OTA Franchise Corporation, Newport Exchange Holdings, Inc., and NEH Services, Inc., and<br><br>**SAMUEL R. SEIDEN**, individually and as an officer of OTA Franchise Corporation,<br><br>*Defendants*. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **FRAUD,**<br><br>2. **INTENTIONAL MISRPRESENTATION,**<br><br>3. **CONCEALMENT,**<br><br>4. **BREACH OF EXPRESS WARRANTY,**<br><br>5. **UNJUST ENRICHMENT,**<br><br>6. **VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE §§ 1750, *ET SEQ.*,**<br><br>7. **UNTRUE AND MISLEADING ADVERTISING IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*, AND**<br><br>8. **VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF COMPLAINT ........................................................ 1

II.   PARTIES ................................................................................ 4

    A.   Plaintiffs ....................................................................... 4

    B.   Defendants ................................................................... 5

III.  INDEPENDENT AND JOINT ACTION .................................... 8

IV.  PERSONAL LIABILITY OF INDIVIDUAL DEFENDANTS .............. 9

V.   JURISDICTION AND VENUE ............................................... 12

VI.  FACTUAL ALLEGATIONS ................................................... 13

    A.   OTA Background .......................................................... 13

    B.   OTA Advertising Campaign ........................................... 14

    C.   OTA Sales Events ........................................................ 15

        1.   Market Timing Preview Event ................................. 15

        2.   Market Timing Orientation ..................................... 16

    D.   Defendants' Deceptive Conduct ....................................... 17

        1.   Misrepresentations Regarding Earning Income with OTA Training ............................................................. 18

        2.   Misrepresentations Regarding OTA's Strategies ................... 20

            a.   Patented Market Timing Strategy ................................. 20

            b.   3-to-1 Reward-to-Risk Ratio Strategy ........................... 22

            c.   Daily Grid Strategy ................................................... 23

        3.   Misrepresentations Regarding OTA "Instructors" and "Education Counselors" ................................................. 24

        4.   Misrepresentations Regarding the Successes of OTA Instructors ................................................................. 26

            a.   Unsubstantiated Historical Success ............................. 26

            b.   Unsupported Live Success ......................................... 28

      5.     Misrepresentations Regarding OTA Students ......................... 29

          a.     No Experience Required................................. 29

          b.     Minimal Amount of Investment .................................... 31

          c.     Minimal Amount of Time Spent Trading .................... 32

      6.     Fraudulent Concealment ......................................... 34

          a.     OTA Did Not Monitor Students' Trading Performance 34

          b.     OTA's Limited Surveys Suggest Most Students Did Not Earn Income Through Trading ...................................... 35

          c.     TradeStation Reports Confirm Most Students Did Not Earn Income Through Trading ...................................... 36

          d.     Samuel Seiden's Admissions ........................................ 36

          e.     Gag Provision in Refund Agreements........................... 37

  E.     Estimated Consumer Losses ................................................. 38

VII. ENROLLMENT AGREEMENT ........................................................ 39

  A.     Take It or Leave It Agreement with No Negotiations ....................... 39

  B.     Disclaimers in Agreement Contradict Representations in Real Life 39

  C.     Arbitration Provision......................................................................... 40

VIII. STATUTE OF LIMITATIONS ....................................................... 43

  A.     The Statute of Limitations Does Not Bar Plaintiffs' Claims ............. 43

  B.     Fraudulent Concealment Tolled the Statute of Limitations............... 44

IX.   CLASS ALLEGATIONS.......................................................... 46

X.    CAUSES OF ACTION AND CLAIMS FOR RELIEF .......................... 51

FIRST CAUSE OF ACTION
(Fraud Against All Defendants) ................................................... 51

SECOND CAUSE OF ACTION
(Intentional Misrepresentation Against All Defendants) ............................ 53

THIRD CAUSE OF ACTION
(Concealment Against All Defendants) ....................................... 55

FOURTH CAUSE OF ACTION
(Breach of Express Warranty Against Corporate Defendants) ................... 56

FIFTH CAUSE OF ACTION
(Unjust Enrichment Against All Defendants) .............................................. 57

SIXTH CAUSE OF ACTION
(Violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750,
        *et seq.*, Against All Defendants) ......................................................... 58

SEVENTH CAUSE OF ACTION
(Untrue and Misleading Advertising in Violation of Cal. Bus. & Prof. Code
        §17500 *et seq.* Against All Defendants) ........................................... 59

EIGHTH CAUSE OF ACTION
(Violations of Cal. Bus. and Prof. Code §§ 17200, *et seq.* Against All
        Defendants) ........................................................................................ 60

XI.   PRAYER FOR RELIEF ...................................................................... 61

XII.  DEMAND FOR JURY TRIAL .......................................................... 62

Amy Jine and Ana Biocini ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against OTA Franchise Corporation, Newport Exchange Holdings, Inc., NEH Services, Inc., Eyal Shahar, and Samuel R. Seiden (collectively, "Defendants"). Plaintiffs hereby allege, on information and belief, except as to those allegations which pertain to the named Plaintiffs, as follows:

## I.    NATURE OF COMPLAINT

*Online Trading Company is a "fraudulent business"*

*"I have overwhelming proof of that fraud"*

*"I have seen 2 other companies in our industry be shut down by regulators within 24 hours for far less than what Eyal [Shahar] is allowing to happen through OTA. OTA has employees who worked at those firms"*

*"I got more emails today (every day) [from students] that are losing money because of OTA"*

**–SAMUEL R. SEIDEN**
**Chief Trading Strategist, Online Trading Company**

1.    Defendants OTA Franchise Corporation and Newport Exchange Holdings, Inc., and NEH Services, Inc. (collectively, "Corporate Defendants") do business as Online Trading Academy ("OTA"), a fraudulent investment education scheme. Defendants Eyal Shahar and Samuel R. Seiden (collectively, "Individual Defendants") are individuals and OTA executives that—both independently and jointly with the Corporate Defendants—created, implemented, and/or participated in the acts and practices set forth in this Complaint and are personally liable for the conduct, as alleged herein. Defendants have been engaged in a nationwide ruse since at least 2012, claiming to offer consumers a low-investment, high-profit, online trading strategy. Defendants target elderly individuals, making representations to them that they are likely to grow their wealth substantially if they purchase Defendants' expensive investment training and use Defendants' allegedly patented strategy. Defendants have no reasonable basis to support their representations regarding OTA's strategy, as they do not track the trading

---

**CLASS ACTION COMPLAINT**                                              1

performance of their students, a fact which they also fail to disclose to their students. The vast majority of students who receive OTA training do not make the advertised income. Indeed, many students, including elderly individuals, lose their own money and have reduced capacity to replace their lost savings. Countless students are additionally saddled with high interest loans Defendants had induced them to take out to pay for OTA training, though such loans are not the subject of this Complaint. Numerous students paid Defendants tens of thousands of dollars, with some paying $50,000 or more. This fraudulent scheme affected tens of thousands of Americans.

2.    Government regulators have taken notice of Defendants' fraudulent scheme. On February 12, 2020, the Federal Trade Commission ("FTC") filed a complaint against all of the same Defendants plus Darren Kimoto for violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Consumer Review Fairness Act of 2016, 15 U.S.C. § 45b.[1] The FTC files a complaint when it has "reason to believe" that the named defendants are violating, or are about to violate the law, and it appears to the FTC that a proceeding is in the public interest.[2] The FTC also moved for a temporary restraining order, an asset freeze, appointment of a receiver, other equitable relief, and an order to show cause why a preliminary injunction should not issue against defendants, which the federal court granted on February 25, 2020.[3] In granting the motion, the court found, *inter alia*:

> (a)    In numerous instances, defendants, in marketing and selling
> trading and investing training programs, instructional materials,

---

[1] *See* Complaint for Permanent Injunction and Other Equitable Relief, *FTC v. OTA Franchise Corp., et al.*, No. 8:20-cv-00287 (Feb. 24, 2020), ECF No. 1.

[2] *See* "FTC Sues Online Trading Academy for Running an Investment Training Scheme." FTC Press Release (Feb. 12, 2020), available at https://www.ftc.gov/news-events/press-releases/2020/02/ftc-sues-online-trading-academy-running-investment-training.

[3] *See* Temporary Restraining Order with Asset Freeze, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, *FTC v. OTA Franchise Corp., et al.*, No. 8:20-cv-00287 (Feb. 24, 2020), ECF No. 46.

and related goods and services, have made false or unsubstantiated representations that consumers who purchase defendants' programs will likely earn substantial income, any consumer can learn and use defendants' strategy to earn income without significant investable capital or free time, and defendants' instructors have amassed substantial wealth by trading in the financial markets.

(b)     In numerous instances, defendants have used standardized refund agreements to inhibit customers' ability to post negative reviews about defendants and their services or communicate with law enforcement agencies and others about defendants and their services.[4]

3.     Under the **temporary restraining order**, the federal court barred defendants from making false, misleading, or unfounded representations to consumers about OTA training, including earnings claims.[5] The court also prohibited OTA from making or enforcing contracts that limit consumers' ability to speak to law enforcement agencies or post reviews online.[6] Moreover, the court barred OTA from collecting payments on the loans it made to customers to finance purchases from the company and prohibited OTA from selling the debt to others or report consumers to credit bureaus for non-payment of the loans.[7] Additionally, the order temporarily freezes defendants' assets and limits how much individually named defendants can spend to preserve funds for potential redress to consumers.[8]

4.     On April 2, 2020, the federal court granted FTC's request for a

---

[4] *Id.* at 2.

[5] *Id.* at 6-7.

[6] *Id.* at 7-8.

[7] *Id.* at 8.

[8] *Id.* at 10-11.

**preliminary injunction** to halt OTA's alleged illegal practices (**Ex. A**).[9] Under the preliminary injunction's terms, the defendants are prohibited from making false, misleading, or unfounded representations to consumers about OTA training, including earnings claims.[10] OTA also is prohibited from making or enforcing contracts that limit consumers' ability to speak to law enforcement agencies or post reviews online.[11] The preliminary injunction appoints a monitor to oversee OTA's marketing materials and practices and provide periodic reports to the court on this subject.[12] The preliminary injunction freezes OTA's assets and limits how much the individual defendants can spend to preserve funds for potential redress to consumers.[13]

## II.   PARTIES

### A.   <u>Plaintiffs</u>

5.   Plaintiff **Amy Jine** resides in Pleasanton, California. On or around September 14, 2019, based on OTA's fraudulent representations and omissions, Ms. Jine enrolled in OTA's Market Timing Orientation and paid OTA $299.

6.   Plaintiff **Ana Biocini** resides in Oakland, California. On or around April 22, 2017, based on OTA's fraudulent representations and omissions, Ms. Biocini enrolled in OTA's Market Timing Orientation and paid OTA $299. At the conclusion of the Market Timing Orientation, and based on OTA's further fraudulent representations and omissions, she enrolled in OTA's Core Strategy Program for $14,500. On or around January 5, 2018, Ms. Biocini complained to Better Business Bureau about OTA's practices.

---

[9] *See* Preliminary Injunction, *FTC v. OTA Franchise Corp., et al.*, No. 8:20-cv-00287 (Apr. 2, 2020), ECF No. 130.

[10] *Id.* at 7-8.

[11] *Id.* at 8-9.

[12] *Id.* at 18-20.

[13] *Id.* at 11-13.

**B.**     <u>Defendants</u>

7.     Defendant **OTA Franchise Corporation** ("OTA Corp."), doing business as OTA, is a Nevada corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614. OTA Corp. is wholly owned by Defendant Newport Exchange Holdings, Inc. (*see infra*). OTA Corp. purports to operate 10 OTA centers, holding itself out to consumers as "Online Trading Academy." OTA Corp. transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, OTA Corp. has advertised, marketed, distributed, or sold training programs and related goods and services to consumers throughout the United States.

8.     Defendant **Newport Exchange Holdings, Inc.** ("NE Holdings"), also doing business as OTA, is a California corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614. NE Holdings is wholly owned by Defendant Eyal Shahar and his spouse. NE Holdings purportedly operates the OTA center in Irvine, California, holding itself out to consumers as "Online Trading Academy," and extending credit to consumers interested in a loan to fund their purchase. NE Holdings also purports to hold the "patent" OTA touts in its marketing and sales pitch. NE Holdings transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, NE Holdings has advertised, marketed, distributed, or sold training programs and related goods and services to consumers throughout the United States.

9.     Defendant **NEH Services, Inc.** ("NEH Services"), also doing business as OTA, is a California corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614. NEH Services is wholly owned by Defendant NE Holdings. NEH Services purportedly does not operate any OTA centers. Instead, OTA Corp. created NEH Services to funds loans made by OTA

franchisees to consumers seeking to purchase OTA training. NEH Services has guaranteed a loan taken out by NE Holdings. NEH Services' bank accounts suggest it is nothing more than a conduit through which funds pass from a third party loan servicer to NE Holdings. NEH Services transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, NEH Services has advertised, marketed, distributed, or sold training programs and related goods and services to consumers throughout the United States.

10. Defendant **Eyal Shahar** is sued herein as an officer of the Corporate Defendants. Shahar is the founder and owner—directly or indirectly—of OTA Corp., NE Holdings, and NEH Services. He is also the sole officer and director of each of these Corporate Defendants. At all times material to this Complaint, acting independently or jointly with others, Shahar has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Shahar, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11. As OTA's top executive, Shahar is also involved in its day-to-day operations in marketing, finance, and sales, and has ultimate control of all of its business. He is directly involved in OTA's sales and marketing, including the performance of OTA's Market Timing Orientation ("MTO") presenters and their efforts to address consumers who seek evidence that students actually make money with OTA training. Shahar reviewed OTA's first internal survey, which showed that most responding students were not making money. According to testimony by OTA's Vice President of Admissions, Keeley Hubbard, in an investigational hearing on June 21, 2019, the results were so negative that Shahar forbade anyone in the meeting on the survey from taking the results outside of the room. Shahar also sought to keep people outside of the meeting from learning of the survey results.

12.   Defendant Shahar is also sued herein ***independently***, in his personal capacity. Shahar is involved, independent of the Corporate Defendants, in hyping up and raising money to expand OTA's operations through franchising. On information and behalf, Shahar pitched to wealthy investors that he had a lucrative financial education business called OTA.

13.   Defendant **Samuel R. Seiden** is sued herein as an officer of the Corporate Defendants. Seiden joined OTA in early 2006, is OTA's Chief Trading Strategist, and has previously served in numerous other executive roles at OTA, including in Product Innovation & Education/Product Strategy and in Sales Innovation & Sales Strategy. In at least some of these executive roles, he directly reported to Shahar. At all times material to this Complaint, acting independently or jointly with others, Seiden has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Seiden, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.   As one of OTA's top executives, Seiden is also the creator and most visible proponent of OTA's trading strategy, whose purported income generation potential is the main reason offered for consumers to purchase OTA training. OTA features Seiden prominently in its advertising and holds him out to consumers at OTA's sales events as the creator of OTA's patent and "an impeccable master" of its trading strategy. Seiden curated the OTA MTO presentation from 2014 to 2017. He also participated in managing the MTO sales process, including addressing issues with individual salespeople's compensation or performance, and disseminating an "MTO Master Document" outlining the content to be delivered at each phase of the MTO sales pitch.

15.   Defendant Seiden is also sued herein ***independently***, in his personal capacity. Seiden is involved, independent of the Corporate Defendants, in hyping up, raising money for OTA, and driving consumers to OTA through making

appearances on TV and radio and contributing to investment publications.

16.    Seiden briefly left OTA in late 2018, citing a dispute about pay, a "decline in student success," "Unethical & Deceptive Sales Messaging," and hearing from students who were "struggling to pay monthly finance payment[s]." In a November 20, 2018 email to Hubbard, OTA's Vice President of Admissions, Seiden called OTA a "fraudulent business," claimed to have "overwhelming proof of that fraud," and noted "I have seen 2 other companies in our industry be shut down by regulators within 24 hours for far less than what Eyal [Shahar] is allowing to happen through OTA. OTA has employees who worked at those firms." Seiden also noted receiving emails "every day" from consumers "that are losing money because of OTA." Seiden was in the meeting on OTA survey results and "for him . . . this was proof" of "student success declining" and he procured a copy despite Shahar's order quarantining it, according to testimony by Hubbard. OTA transferred $500,000 to Seiden in December 2018, and he returned to work at OTA shortly thereafter.

17.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this Complaint, and individuals, the identities of which are presently unknown, have also participated with Defendants in the offenses alleged in this Complaint.

## III.  INDEPENDENT AND JOINT ACTION

18.    Each Individual Defendant acted independently at times and jointly with the other Defendants at other times with respect to the acts, violations, and common course of conduct alleged herein involving OTA's fraudulent investment scheme. Shahar and Seiden formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

19.    The Corporate Defendants have operated as a common enterprise while engaging in OTA's fraudulent scheme. OTA Corp., NE Holdings, and NEH

Services have conducted OTA's business through an interrelated network of companies that have unified advertising, common ownership, officers, managers, business functions, employees, and office locations. They are jointly and severally liable for the acts.

20.   Each Defendant has ratified and approved the acts of each of the other Defendants. Each Defendant aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in making false representations to, and fraudulently concealing information from, Plaintiffs and the Class. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each Defendants acted with an awareness of his/its independent wrongdoing and realized that his/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## IV.   PERSONAL LIABILITY OF INDIVIDUAL DEFENDANTS

21.   Based on information and belief, the Individual Defendants are the alter egos of the Corporate Defendants. Shahar and Seiden have maintained such a unity of interest and ownership that the separate personalities of the corporate entities and the individuals no longer exist and that an inequitable result would follow if the entities and individuals are treated as separate.

22.   Shahar and the Corporate Defendants are not separate entities. As reflected below, Shahar is the sole officer and director of each of the Corporate Defendants:

      **(a)**     **OTA Corp.:** OTA Corp.'s (Profit) Initial/Annual List of Officers, Directors, and State Business License Application filed with Nevada's Office of the Secretary of State on February 25, 2019 identifies Shahar as the President, Secretary, Treasurer, and Director of OTA Corp. No other officers or directors are identified. Similarly, the same form filed with the same office on

April 27, 2004 identifies Shahar as the President, Secretary, Treasurer, and Director of OTA Corp. No other officers or directors are identified. Likewise, the Articles of Incorporation filed with the same office on March 8, 2004 only lists Shahar next to Board of Directors/Trustees.

(b)    **NE Holdings:** NE Holdings' Statement of Information filed with California's Office of the Secretary of State on December 4, 2017 identifies Shahar as the Chief Executive Officer, Secretary, and Chief Financial Officer. It also only lists Shahar under Directors. The same form filed with the same office on November 27, 2019 indicates there has been no change in any of the information contained in the last Statement of Information filed.

(c)    **NEH Services:** NEH Services' Statement of Information filed with California's Office of the Secretary of State on March 6, 2015 identifies Shahar as the Chief Executive Officer, Secretary, and Chief Financial Officer. It also only lists Shahar under Directors. The same form filed with the same office on November 27, 2019 indicates there has been no change in any of the information contained in the last Statement of Information filed.

23.    As Shahar is the sole officer and director of each of the Corporate Defendants, the separate personalities of Shahar and the Corporate Defendants do not exist.

24.    Upon information and belief, Shahar has disregarded corporate formalities, such as holding corporate meetings, keeping meeting minutes, and maintaining adequate corporate records.

25.    Shahar is personally liable because he is involved, independent of the Corporate Defendants, in hyping up and raising money to expand OTA's operations

**CLASS ACTION COMPLAINT**                                          10

through franchising. On information and behalf, Shahar pitched to wealthy investors that he had a lucrative financial education business called OTA.

26.   Seiden is personally liable because he is involved, independent of the Corporate Defendants, in hyping up, raising money for OTA, and driving consumers to OTA through making appearances on TV and radio and contributing to investment publications.

27.   The Corporate Defendants are therefore owned by the same person (Shahar), operated by the same people (Shahar and Seiden), and are shells and conduits for the Individual Defendants' affairs. The corporate form was merely an illusion that permitted Sharhar and Seiden to benefit.

28.   An inequitable result would follow if the facts alleged in this Complaint are treated as those of the Corporate Defendants alone given that the Individual Defendants created and maintained the fraudulent scheme that is OTA for many years:

    (a)    Shahar ultimately authorizes and controls OTA's operations and is directly involved in the marketing and sales of OTA training, which means he has knowledge of OTA's fraudulent claims.

    (b)    Seiden has direct knowledge of the fraudulent earnings and related claims through his own participation in making those claims at MTO events and directing other MTO presenters to make such claims.

    (c)    Seiden's trading results put him on notice that the claims were false (*see infra*).

    (d)    Seiden flat out stated that OTA was a "fraudulent business."

    (e)    Shahar and Seiden directly participate in, and have authority and control over, OTA's deceptive marketing, and knew of, or at minimum recklessly disregarded, the false, misleading, and unsubstantiated nature of OTA's claims.

(f)     Shahar and Seiden were aware that OTA's own surveys showed its claims were untrue.

29.   Disregarding Shahar and Seiden's involvement in the scheme would essentially sanction the fraud and promote injustice. Tens of thousands of consumers, many of whom are elderly individuals with limited resources and reduced capacity to replace their lost savings, have been injured as a result of the Individual Defendants' scheme that has resulted in consumer losses of over $370 million from January 2014 to May 4, 2019.

## V.   JURISDICTION AND VENUE

30.   This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), as to the named Plaintiffs and the proposed class ("Class"), because the Class contains more than 100 members, the aggregate amount in controversy exceeds $5 million, and members of the Class ("Class Members") reside across the United States and are therefore diverse from Defendants. The Court also has supplemental jurisdiction over Plaintiffs and the Class' state law claims pursuant to 28 U.S.C. § 1367(a).

31.   This Court has personal jurisdiction over Defendants because they have significant minimum contacts with California, and/or they otherwise intentionally availed themselves of the laws and markets of California through the promotion, marketing, and advertising of OTA in California and on the Internet to consumers in California.

32.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Indeed, until recently, OTA has offered numerous programs and courses of instruction in Irvine, California. Plaintiffs have filed an affidavit showing that this action has been commenced in a proper county pursuant to California Civil Code § 1780(d) (*see* **Ex. B**).

# VI.  FACTUAL ALLEGATIONS

## A.  OTA Background

33.  Shahar founded OTA in Irvine, California in 1997. OTA operates through 10 separate locations across the United States and abroad as well as over 30 franchise locations. OTA employs around 500 to 1,000 people and has had over 250,000 students over the years.

34.  OTA offers three learning tracks: Core Strategy, Extended Learning Track (XLT), and Mastermind Community. Core Strategy and XLT tracks each contain various programs, such as Stocks, Forex, Futures, Options, etc. The Mastermind track is a bundle of OTA's most elite training and support, including a subscription that allegedly permits subscribers to reduce the time they spend identifying profitable trades because it contains the "Daily Grid," which provides subscribers with a list of price ranges, or "zones" in which an asset's price will change direction, for several dozen specific financial assets.

35.  Currently, the Core Strategy course, which is a prerequisite for all other programs and is on the lowest learning track, costs $7,700. The XLT courses begin at $9,350 for the first three months and $700 per month thereafter, or $13,750 for life, and requires the completion of the Core Strategy course. The Mastermind Community, which is the most expensive offering, costs $15,000 for the first year and $5,000 per year thereafter, or $25,000 for life, and requires the completion of at least three XLT courses in addition to the Core Strategy course.

36.  OTA began offering franchises for trading education and training centers operated by independent owners on April 20, 2004. The initial franchise fee ranges from $100,000 to $250,000. OTA exercises significant control over its franchises, providing training to the franchisees' salesforce and materials to guide their sales pitches. OTA also requires franchisees to pay multiple and significant advertising and marketing fees over which OTA has sole discretion (*e.g.*, a Marketing and Advertising Fee of the greater of $1,000 or 3% of monthly gross

volume, a Special Marketing Projects fee of up to $50,000 per year, and a Global Marketing Services fee of up to $15,000 per month). Franchises are an extension of OTA and have no independent power or authority regarding the training offered.[14] Franchises must therefore provide the same, uniform learning experience as OTA-owned locations.

37.   OTA's estimated yearly revenue is $150 million.

**B.**   **OTA Advertising Campaign**

38.   Defendants centrally control OTA's advertising campaign. They have marketed, advertised, and sold OTA training, including seminars, courses, and instructional materials on trading and investing, to consumers throughout the United States and internationally since at least 2004.

39.   Defendants mass advertise its training to consumers nationwide through the Internet, direct mail, telemarketing, television, and radio. OTA runs 30-minute infomercials on nationwide television, radio ads from New York City (where they aired over 10,000 times in the last two years) to Fargo, North Dakota, and videos on its website and YouTube.

40.   Regardless of advertising medium, the theme of OTA's advertising campaign is that consumers will generate substantial income through online trading in the financial markets with OTA training. For example:

> (a)   In a 2019 TV infomercial, OTA advertises a "rules-based strategy" to "generate daily or monthly income," labeling it "a proven step-by-step approach," and providing testimonials, including a consumer who "made $12,000" in three hours and another who "made $32,000 in less than seven trading days."

---

[14] For example, franchises must "purchase, use and offer each of, and only, the types, brands and/or quality of Course Materials, Educational Products, broker-dealer services and other products and services as [OTA] designate[s] and, where [OTA] require[s], use only those suppliers that [OTA] designate[s]. [Franchises] will be required to follow the 'Curriculum' or course outline established by [OTA] for use within the Center classrooms."

(b) In a 2018 radio ad that ran at least 880 times, OTA advertised "more income" through a "proven step by step approach to investing" that "can work in any market condition" and "generate active income . . . and create passive income to build your retirement."

(c) In a 2018 radio ad that ran at least 581 times, an alleged OTA "student" claims "it's almost like having a second paycheck without having a second job," and that any ordinary person can do it.

(d) In a 2018 TV infomercial, OTA contends that all consumers can benefit from its training, "[w]hether you only have a few hours a week or a few hours a month . . ."

(e) In a 2019 Fargo radio ad, OTA makes the same contention, stating, "80 percent of the individuals that come through our doors don't know a stock from a rock."

41.    The objective of OTA's advertising campaign is to drive consumer to attend a free, three-hour preview event called "Market Timing Preview" or "Power Trading Workshop" (*see infra*) where consumers believe they will learn how to make money in the financial markets. In addition to these live events, typically held in hotel conference rooms and over 40 brick-and-mortar training centers throughout the United States and internationally, OTA training programs are for sale online.

## C.    OTA Sales Events

### 1.    Market Timing Preview Event

42.    The Market Timing Preview Event is typically a free three-hour seminar held at an OTA center or franchise. The goal of the Market Timing Preview is to entice students to enroll in a three-day MTO event (*see infra*). While the three-hour Preview Event is free, consumers do not learn about market timing or power trading at this event. Instead, consumers endure a marketing ploy reminiscent of a

timeshare presentation during which OTA representatives regurgitate the claims made in the advertising campaign. The Preview Event is essentially a sales presentation pitching the MTO event, where consumers allegedly learn how to reliably time the financial markets. OTA informs consumers that, after attending the MTO event, they will have all the necessary tools to trade like a professional and that they can re-take the MTO event as many times as they wish. Many consumers believed they would be able to trade in the financial markets with confidence after participating in the MTO event.

43. Illustrative examples of Defendants' deceptive business activities at the Preview Event are set forth *infra*.

## 2. Market Timing Orientation

44. The MTO event is a three-day sales presentation and Defendants' main sales platform for OTA's programs, courses, and membership. OTA advertises the MTO event's cost as $600 but typically sells it for $299. OTA "instructors" present and "education counselors" staff the MTO event. The instructors and education counselors are salespeople paid on commission despite their titles. During the first two days, instructors provide general information about the financial market and asset classes to consumers. Throughout the MTO event, each consumer meets individually with an education counselor multiple times to discuss, select, and purchase OTA tracks (*e.g.*, the XLT track), courses (*e.g.*, the Core Strategy course, which is a prerequisite for all other programs), and membership to the Mastermind Community.

45. At the MTO event, OTA's instructors expand on the earnings claims made in the advertising campaign and Preview Event. Instructors present testimonials and simulated trades intended to deceive consumers into thinking that they can earn large profits with small investments with OTA training and replace or supplement their existing jobs with online trading. Instructors give consumers the impression that they can make the same hypothetical trades and become the

testimonials presented.

46.    OTA assigns an education counselor to every student who enrolls in the three-day MTO event. The education counselor is supposed to make contact with each student a number of times before the MTO event concludes ("Touch Points"). During the Touch Points, the education counselor introduces, and asks the student to complete, an Income and Wealth Education Planner, a questionnaire that requests consumers to disclose all of their assets, including real estate and retirement accounts, which the educational counselors then leverage in their sales pitch. OTA gives potential students the impression that admission into the OTA is selective but, in fact, OTA will enroll anyone who has the money to pay for the course or who is eligible for financing.

47.    OTA's objective is to drive sales to multiple programs, higher priced programs, and Mastermind Community membership from the MTO event. Education counselors pitch the Mastermind Community to consumers with extensive assets, which costs $25,000 for a lifetime membership but also requires consumers to purchase a number of prerequisite courses. Education counselors pitch packages that range from thousands of dollars to hundreds of thousands of dollars for those with more limited assets. Like other scams, education counselors inform consumers that the prices already reflect discounts, and the discounts expire if consumers decide to purchase after the MTO event concludes.

48.    Illustrative examples of Defendants' deceptive business activities at the MTO event are set forth *infra*.

**D.    Defendants' Deceptive Conduct**

49.    Defendants have deceived consumers since at least 2012, claiming that OTA training will allow them to generate significant earnings through online trading in the financial markets and causing each of its students to spend up to tens of thousands of dollars on OTA programs, courses, and membership. Defendants have done so by luring consumers, including elderly individuals, to register and

attend the initial free Preview Event, next the $299 MTO event, and finally additional programs ranging from $7,700 to $25,000 with false and unsubstantiated promises of generating significant earnings through trading in the financial markets. OTA has already taken more than $370 million from consumers in the United States since 2014. Illustrative examples of Defendants' deceptive conduct are set forth below, though not limited thereto.

### 1. Misrepresentations Regarding Earning Income with OTA Training

***"[S]tudents ... averag[e] about 300 dollars a day" and could make "75 grand a year as a secondary form of income[.]"***

**—OTA Presenter, Dale Sargood, at a MTO Event**

50.     OTA misrepresents to consumers through its nationwide advertising campaign and sales events in dozens of cities that they can earn income through OTA training. OTA also misrepresents the income can be substantial in terms of dollar amounts:

(a)     At a MTO event on March 22, 2019, OTA presenter, Darren Kimoto, indicated consumers who follow OTA strategies would make $800 per day, which is $200,000 per year, spending an hour a day on trading.

(b)     At the MTO event on March 21, 2019, Kimoto stated you can "[f]ind, analyze, execute," a trade "in less than 10 minutes," and that you can do "that every day, find a trade every other day, make an extra 600 bucks."

(c)     At a MTO event, OTA presented a "plan" for a consumer yielding "Avg. $300/Day" using only "$5,000" of capital and "2 Hours/Day."

(d)     At a MTO event on June 28, 2019, OTA presenter, Darek Zalek, posed, as if it is realistic, "[I]f you make 9,000 dollars in a day,

you know, or five grand in a day, how many of these do you need to pay off the [OTA] tuition? I'm just saying, you know. Not too many, yes or no?"

(e)    At a MTO event in November 2019, OTA presenter, Dale Sargood, indicated he only spends "30 minutes to an hour a day" trading and "students ... averag[e] about 300 dollars a day[.]" He suggests consumers would make "75 grand a year as a secondary form of income" and with a $5,000 futures account and with "3,300 invested" you could earn "100 grand a year[.]"

(f)    At a MTO event on March 22, 2019, Kimoto claimed that consumers "would have made about $94,000 last year just taking those trades in those [XLT] sessions with us" in 2018.

(g)    At a MTO event, OTA offered a January 16, 2013 testimonial stating, "I'm profitable 85% of the time," and claiming monthly profits in the thousands or tens of thousands of dollars.

(h)    At a MTO event, OTA provided a testimonial from a "student" who achieved a 31.7% profit in "Short Term Income" with "No Prior Trading Knowledge."

51.    OTA also represents the income will be substantial in general terms:

(a)    In various radio ads between 2018 and 2019, OTA claimed consumers will learn to "generate income," or "daily income," or "monthly cash flow."

(b)    At a Preview Event on June 12, 2019, OTA presenter, Tarantino Smith, claimed OTA would help consumers make "trading [your] primary source of ... income," calling it "fire [your] boss level" income.

(c)    At the same event, Smith stated consumers come to OTA to make income that allows them to work less, "so you can spend more

time with the family."

(d)    At a MTO event on March 22, 2019, OTA presenter, Darren Kimoto, presented a testimonial stating, "It took me 18 years to develop a decent salary. After three months here at OTA, I'm making almost as much money as my business."

52.    OTA represented to consumers, through various examples and testimonials, that they will be able to earn substantial income by purchasing OTA training. OTA knew that its representations were false when it made them because OTA did not monitor its students' trading performance. OTA's limited surveys indicated that most of its students did not trade or lost money when they traded, and TradeStation (the online trading platform used by OTA students) confirmed such indications. *See*, *infra*, at Fraudulent Concealment. OTA intended consumers to rely on its representations of earnings because it intentionally failed to disclose that it did not track students' trading performance or the results from its limited surveys or TradeStation reports. Consumers reasonably relied on OTA's representations of earnings when they purchased OTA training given the specific nature of the examples and seemingly honest testimonials. Consumers were harmed because each paid substantial money for OTA training that failed to materialize into the substantial income that OTA advertised and expanded on at the sales events. Consumers' reliance on OTA's representations of substantial earnings were a substantial factor in causing them to lose money.

## 2.    Misrepresentations Regarding OTA's Strategies

*"Over 35,000 of our graduates have the opportunity to live more comfortable and satisfied lives as a result of the skills they've learned here at the Academy."*

**—Eyal Shahar's Welcome Letter to All Students That Enroll in the MTO Event**

### a.    Patented Market Timing Strategy

53.    OTA misrepresents its strategies to consumers. First, it advertises to consumers that it has a patented strategy to time the market that anyone can apply

to generate substantial profits through trading in stocks, foreign currencies, commodities, or other assets. Specifically, OTA's patent on timing the market and strategy purportedly permits its students to realize when to buy and sell investments. This is a false and misleading representation of the patent. While OTA does, in fact, have a patent for a Computer Based Trading System Utilizing Supply and Demand Analysis (U.S. Pat. No. US8650115B1), OTA has not substantiated and cannot substantiate its claim that consumers are likely to profit using OTA's patented strategy and that OTA's patented strategy achieves the results described in its advertisements. Nevertheless, OTA references its patent as proof that its strategy works. OTA has made the following misrepresentations regarding its patented strategy:

    (a)    At a Preview Event on December 13, 2018, OTA presenter, Dawn Landry, asserted OTA "has a patent on the fact that you can time the markets," and the "strategy" it teaches is "a set of rules" that "gives us the ability to know when to get in and when to get out."

    (b)    Similarly, at a Preview Event on June 12, 2019, OTA presenter, Tarantino Smith, assured consumers they can safely ignore people who "say, 'Oh, they can't time the market,'" because "to get a patent, we had to ... prove it to the Government." Such a claim is false, and misunderstands the nature of obtaining a patent.

    (c)    At a Preview Event on December 13, 2018, OTA presenter, Landry explained OTA's "core strategy is a set of rules" that identifies where "there's a high probability" price will move to a certain point.

    (d)    At the conclusion of Preview Events, consumers who enroll in the MTO event received a welcome letter right from Eyal Shahar

**CLASS ACTION COMPLAINT**                 21

claiming that the MTO event will introduce OTA's "patented supply and demand trading and investing strategy which allows us to anticipate market moves with a high degree of accuracy." Shahar's letter also contends "[o]ver 35,000 of our graduates have the opportunity to live more comfortable and satisfied lives as a result of the skills they've learned here at the Academy."

(e)    At a MTO event on March 23, 2019, OTA presenter, Kimoto, claimed OTA gives purchasers "rules, verified rules, tested rules that we know work[.]"

(f)    At a MTO event on March 21, 2019, OTA presenters stressed to consumers the strategy "stack[s] odds in your favor" and that profits are a "mathematical certainty."

### b.    3-to-1 Reward-to-Risk Ratio Strategy

54.    Second, OTA advertises to consumers that it has a "3-to-1 reward-to-risk ratio" strategy, whereby each winning trade will yield profits of three times what is risked, more than making up for losses on losing trades. Despite that this strategy is only based on hypotheticals, OTA nevertheless emphasized it, misrepresenting consumers' actual reward-to-risk ratio:

(a)    At a MTO event on March 22, 2019, OTA presenter, Darren Kimoto, claimed, "So every day you expect one to be a loser, one to be a winner, on average. Three-to-one. So you lose one on one and you make three on the other, so everyday you're coming out with a -- basically two times your risk. So whatever you're risking, every day you're making twice that on average."

(b)    At a MTO event on May 9, 2019, OTA presenter, Rick Wright, remarked, "Reward-to-risk ratio. . . . [Y]ou should start with a 3 to 1. I'm going to risk 10 bucks to make 30 . . . [I]f you're disciplined and can follow the rules, . . . you only have to be right

1 . . . 25 percent of the time . . . to break even."

2 (c) At a MTO event on March 21, 2019, Kimoto depicted the effect

3 of the "3-1 reward-to- risk ratio" with a hypothetical week of

4 trading in which each trade either loses $100 or gains $300,

5 yielding a profit of $2,000 for the week.

6 (d) At a MTO event on November 21, 2019, OTA presenter, Dale

7 Sargood, illustrated a hypothetical week of ten trades in which

8 each trade either loses $4,000 or gains $12,000, with only three

9 winning, overall yielding a profit of $8,000 for the week.

10 **c.     Daily Grid Strategy**

11 55.    OTA also misrepresents the benefits of the Daily Grid, a feature of the

12 Mastermind Community:

13 (a) As discussed, *supra*, Mastermind's "Daily Grid" allegedly

14 identifies "zones," in which an asset's price will change

15 direction, thereby purportedly enabling traders who use the grid

16 to enter a position just before the turn, buying before the price

17 rises and selling before it falls. The Daily Grid forms the basis

18 for claimed profits. OTA calls the Daily Grid its crown jewel and

19 a major selling point for Mastermind. OTA's analysis of the

20 Daily Grid's selections reflects, however, that most "zones"

21 identified in the Daily Grid never yielded an actual trade because

22 the asset's price did not move into the "zone." OTA's own

23 calculation of the "zone hit rate" is under 50%.

24 (b) At a MTO event on March 22, 2019, OTA presenter, Kimoto,

25 suggested Mastermind is a safety net for profits: "we don't want

26 you going out and finding your own trades at first. So we give

27 you another bank of trades that are pre-vetted called pro picks."

28 (c) At a MTO event on November 20, 2019, OTA presenter, Dale

Sargood, promised consumers will learn by copying instructor's successful trades using their own money.

56.     OTA represented to consumers that its various strategies would enable them to earn substantial income. OTA knew that its representations were false when it made them in light of OTA's lack of monitoring student performance and the results from OTA's limited surveys and TradeStation reports. *See*, *infra*, at Fraudulent Concealment. OTA intended consumers to rely on representations about its financial strategies due to OTA's intentional failure to disclose key information relating to students' trading performance. Consumers reasonably relied on OTA's representations of patented, powerful, and profitable strategies when they purchased OTA training given the frequent references to the patent, the rewards outweighing the risks, the false representations concerning their students' trading outcomes, and the Daily Grid identifying all buy and sell opportunities for consumers. Consumers were harmed because each paid up to tens of thousands of dollars for OTA strategies that failed to work. Consumers' reliance on OTA's representations of seemingly infallible strategies were a substantial factor in causing them to lose money.

### 3.     Misrepresentations Regarding OTA "Instructors" and "Education Counselors"

57.     OTA "instructors" and "education counselors" advertise its purported financial training and strategy to consumers at live sales events like the Preview Event and MTO event. OTA also represents, and creates the impression, that its instructors and counselors are themselves successful traders. OTA holds them out to consumers as teachers and counselors but, in fact, they are salespeople paid on commission:

(a)     OTA's Vice President of Admissions, Keeley Hubbard, testified that experience in financial markets or educational counseling is not required to be hired as an education counselor. Additionally, Preview Event presenters are paid 2% of sales, and MTO

instructors are paid 3% of sales.

(b) A January 25, 2018 offer letter to a former education counselor, Diane Luu, outlined a compensation plan stating, "You will earn commissions from leads and registrations assigned to you by management based on cash collected from your individual 'gross sales.'"

(c) A February 27, 2018 sales training guide advised, "Don't look like, act like or sound like, a traditional salesperson"; indicated that consumers who come to OTA are "Upset," "Frustrated," "Worried," "Tired of…," "Nervous," "Anxious," and "Sick of…"; and stated, "We ask questions to discover the *IMPACT* of the *PAIN* so they will make a decision to buy a *SOLUTION*[.]"

(d) Luu, a former OTA education counselor, stated in her November 7, 2019 declaration: "It was clear to me from the beginning of the recruiting process that the 'Education Counselor' position was a sales position." Additionally, "[a]s an Education Counselor, my role was to sell Online Trading Academy courses and seminars to potential students."

58.   OTA represented to consumers that its instructors and education counselors were, in fact, traders who could truthfully and accurately provide information regarding trading and counselors who could customize an education plan for them. OTA's representations were false because its instructors and education counselors were merely salespeople whose objective was to enroll students in tracks and courses that cost thousands of dollars depending on their financial circumstances. OTA knew its representations were false when it made them because OTA intentionally gave its salespeople deceptive titles and intended that consumers rely on the deceptive titles. Consumers reasonably relied on OTA's instructors and education counselors due to their titles and statements in deciding

whether to purchase OTA training. Additionally, instructors and education counselors give potential students the impression that OTA admission is selective but, in truth, OTA enrolled anyone who had the money to pay for it. Consumers were harmed because each paid up to tens of thousands of dollars for OTA training. Their reliance on OTA's representations relating to its instructors and education counselors was a substantial factor in causing their harm.

### 4. Misrepresentations Regarding the Successes of OTA Instructors

#### a. Unsubstantiated Historical Success

59.    Furthermore, OTA instructors, who sell OTA's training to consumers in live seminars, hold themselves out to potential students as converts and successful traders themselves. The instructors indicate that they themselves are living proof that OTA's financial training works, representing that they became successful traders and amassed substantial wealth using OTA's strategy:

(a)    At a MTO event on March 21, 2019, OTA presenter, Darren Kimoto, claimed that he once "was sitting in your seat right there," and "had been struggling as a trader," with "close to $60,000 in losses."; that after learning to apply OTA's strategy he quit his job "because I was making as much in the trading"; and proceeded to describe the "very affluent neighborhood" he lives in, where "kids in the neighborhood" have "live-in nannies, cooks, gardeners," and the latest Apple iPhones and iWatches.

(b)    At a MTO event on June 28, 2019, OTA presenter, Darek Zelek, claimed he was a full-time trader but previously was a contractor who knew nothing about trading until becoming an OTA "student."; described the wealth and exclusivity of the town where he now lives, including that his neighbor is swimming champion Michael Phelps, who taught his daughter to swim; and

informed potential students they would not be able to achieve such wealth "from a regular job," but only "through investments," stating that he purchased his home there with profits from trading; and shared that he drives a "750" (the BMW 750 is a luxury car) and built a "casita" on his property so that his parents can have their own residence when they come to visit his family.

(c)     At a MTO event on November 22, 2019, OTA presenter, Dale Sargood, indicated that he takes his family on seven or eight multi-week vacations every year, for which he budgets $15,000 per week; that he and his children enjoy expensive hobbies; and that OTA "cannot pay me enough" to teach their asset class courses because of their longer duration, which "takes me away from . . . making money."

60.     OTA represented to consumers that its instructors were (and are) successful traders. OTA's representations were false because its instructors were not successful traders. And, in fact, OTA made no effort to determine the trading history or success of its instructors. For example, Samuel Seiden, who OTA holds out as the inventor and most skilled practitioner of OTA's strategy, has done very little trading from January 2016 to October 2019, and the trades he did make yielded a net loss of approximately $20,000. Sean Kim, a MTO presenter who appears in OTA infomercials and is held out by OTA as an expert trader, for years has only managed to break even despite heavy trading on a six-figure account. Darren Kimoto, another MTO presenter, had trading net losses of $17,349 from January 2016 to October 2019 despite a historically strong economic cycle. Darek Zelek, yet another MTO presenter, lost money in 2018, and as of August 2019, had made only a few thousand dollars in 2019.

61.     OTA knew its representations were false when it made them. OTA

intended consumers rely on instructors' representations of their extravagant lifestyles because instructors and education counselors would point to this when potential students asked about how much they would make with OTA training. OTA was therefore aware that its instructors' success was material to consumers' decision to purchase OTA training. Consumers reasonably relied on OTA's representations regarding its instructors' success because they reasonably believed the instructors were traders. Consumers were harmed because each paid up to tens of thousands of dollars for OTA training. Consumers' reliance on OTA's representations relating to its instructors' success was a substantial factor in causing their harm.

### b.    Unsupported Live Success

62.    Like the instructors, the trades performed by them at the MTO are fake, simulated transactions intended to hoodwink potential students into thinking online trading is fast, easy, and lucrative:

(a)    At a MTO event on March 21, 2019, OTA presenter, Kimoto, described, "[This morning . . . I went ahead and placed a trade . . . So that was in . . . 30-minute period of time, ended up locking in $1,200 in profit."

(b)    At a MTO event on June 28, 2019, OTA presenter, Zelek, stated, "I actually have a position right now that I should probably manage. Is it okay if I make some adjustments on my stocks, guys? . . . There, done, I closed for [$]6,050, done.");

(c)    At a MTO event on November 20, 2019, OTA presenter, Sargood, lied, "So this is a, a live trade we have on right now with the S&P 500. . . . this is this morning that we got into that trade here . . . so worst case scenario on this trade we'll make 300 bucks. All right. Are we going to put that in the bank? . . . So we just hit the stop loss there. We are now out of that transaction."

63.    OTA represented to consumers that the fake trades were, in fact, live

**CLASS ACTION COMPLAINT**                                                    28

and actual trades even though they were not. OTA knew that its representations were false when it made them because its instructors hand-picked easy and profitable trades to simulate before performing them. Further, anticipating the conflict presented by instructors' trading success and their employment as OTA instructors, OTA even provided talking points to its education counselors for use in handling consumers' questions about why the instructors would spend time teaching if they made so much money trading, according to the testimony of OTA's Vice President of Admissions Keeley Hubbard. OTA intended that students rely on their instructors' performed trades and, more importantly, believe that they could emulate their instructors' trades on their own. Students reasonably relied on OTA's simulated trades because they witnessed what they thought were live, successful trades. Consumers were harmed because each paid up to tens of thousands of dollars for OTA training that did not adequately prepare them to trade profitably. Indeed, most of OTA's students ultimately did not trade or make money trading. *See*, *infra*, at Fraudulent Concealment. Students' reliance on OTA's representations regarding their instructors' performed trades was a substantial factor in them harm.

### 5.    Misrepresentations Regarding OTA Students

*"[A]s long as I follow the system, the outcome will be provided.]"*

*"[T]his is a skill set that anyone can attain[.]"*

*The "market doesn't care whether somebody's old, young, has experience, has no experience, we just simply plug yourselves into the equation and the outcome will be spitted out."*

**—OTA Presenter, Darek Zelek, at a MTO Event**

#### a.    No Experience Required

64.    In addition to the misrepresentations relating to its employees, OTA misrepresents the minimum skills that consumers need to have to learn and apply OTA training. OTA would have consumers believe that anyone can learn to use its purportedly objective rules and easy steps to earn money regardless of background, education, or skill and that following OTA's steps will automatically result in

**CLASS ACTION COMPLAINT**                                                   29

profits:

    (a)    In a 30-minute TV infomercial released around March 27, 2019, OTA claimed, "[A]nybody could do this from any level. You don't need to have a special type of background."

    (b)    In a radio ad released on February 25, 2019, OTA advertised, "80 percent of the individuals that come through our doors don't know a stock from a rock."

    (c)    In a 30-minute TV infomercial released around March 27, 2019, OTA maintained, "No matter who you are, where you come from, or how much experience you have, at your free class, you'll discover powerful strategies designed to create daily, weekly and monthly income . . ."

    (d)    In a 2018 Market Timing Coursebook, OTA emphasized that it offers "[a]n objective rules-based strategy" composed of "a simple, sequential set of steps[,]" suggesting anyone could follow the strategy and reap profits.

    (e)    At a MTO event on June 28, 2019, OTA presenter, Darek Zelek, attributed his success to a "system," saying, "as long as I follow the system, the outcome will be provided," claiming "this is a skill set that anyone can attain," and the "market doesn't care whether somebody's old, young, has experience, has no experience, we just simply plug yourselves into the equation and the outcome will be spitted out."

    (f)    At a MTO event on November 20, 2019, OTA presenter, Dale Sargood, told consumers that "income production is pretty simple, straightforward, follow the rules, apply the rules, get the result[,]" suggesting earning income is as basic as following rules.

**CLASS ACTION COMPLAINT**                                30

(g) At a MTO event on March 21, 2019, OTA presenter, Darren Kimoto, promised, "There's not one of you that we cannot help," and "it's not an if, it's *when* you get it."

(h) The 2018 MTO coursebook claims OTA training "is designed for students of all experience levels"; OTA strategy "has proven to successfully work regardless of the type of investor you are or the financial markets you trade in"; and that OTA provides "a simple step-by-step, rule- based strategy," that will "consistently identify ... quality trading and investing opportunities with a high degree of accuracy."

### b. Minimal Amount of Investment

65. OTA would also have consumers believe that they do not need to invest a significant amount of money to earn income with OTA training:

(a) At a Preview Event on December 13, 2018, an OTA presenter, Dawn Landry, asserted consumers "could potentially make $50,000 of annual income with an account size as low as $5,000."

(b) At a MTO event on June 29, 2019, OTA presenter, Darek Zalek, told the story of a purported OTA student who had been laid off from a job as an engineer and had only $3,000 to invest after paying for OTA training but a year later was supporting his wife and two children with income from trading.

(c) At a MTO event on March 22, 2019, OTA presenter, Darren Kimoto, illustrated a trade where "[y]ou would have made . . . $1,000 in a day off this trade only using $2,000 in capital to do it"

(d) In a September 16, 2019 MTO presentation, a slide presented a hypothetical trade where "Risk of $100" yields "Profit of $3000."

(e) At a MTO event on November 20, 2019, OTA presenter, Dale

Sargood, presented a hypothetical trade where "a 825 dollar investment" yields "a 900 dollar profit."

(f)  At a MTO event on June 29, 2019, Zelek informed consumers they can start trading futures with as little as $1,700.

(g)  At a MTO event on November 21, 2019, Sargood claimed consumers with only $4,000 can make $200/day trading forex, or could earn the same using only $1,650 if trading in futures.

(h)  At a MTO event on November 22, 2019, Sargood contended consumers with $10,000 to trade can make $60,000 per year.

(i)  The MTO slide deck, which instructors use across both OTA-owned locations and franchise locations, states the minimum required to trade Forex or Stocks is $500.

### c.    Minimal Amount of Time Spent Trading

66.  Similarly, OTA would have consumers believe that they do not need to invest a significant time to earn income with OTA training:

(a)  In a 30-minute TV infomercial released around March 27, 2019, OTA advertised all consumers can benefit from OTA, "[w]hether you only have a few hours a week or a few hours a month . . ."

(b)  At a MTO event on March 21, 2019, OTA presenter, Darren Kimoto, claimed consumers can make profitable trades, such as "a few thousand dollars" on their commutes to work.

(c)  At a MTO event on May 9, 2019, OTA presenter, Rick Wright, maintained that once you learn the strategy, "it will probably take about two to three minutes" to review a chart to find a profitable trade.

(d)  At a MTO event on November 20, 2019, an OTA presenter summarized "so 3,000 dollar investment, right, to make 300 bucks, right, took a couple minutes of time[,]" suggesting that

students can repeat the same.

(e)    At a MTO event on May 9, 2019, Wright claimed he spends "a total of about 30 minutes . . . looking at the screen to see if there's a trade[,]" suggesting that is all the time a student would need to identify a profitable trade.

(f)    At a MTO event, an OTA presenter, Darek Zelek, described a trade as taking 32 seconds to set up and students don't have to watch the trade after that.

(g)    Similarly, at a MTO event on March 22, 2019, Kimoto reassured consumers that they will not be "watching it this whole time," not "sitting there babysitting it," but "off living our life, doing our thing[.]"

(h)    The September 16, 2019 MTO slide deck, which all instructors use, claims OTA training is a "solution" for family with both parents working full time that would yield "$100 Average Per Day[.]"

67.    OTA represented to consumers, through various examples and testimonials, that they will be able to earn substantial income by purchasing OTA training. OTA knew that its representations were false when it made them because it had no basis to make such representations as it did not monitor its students' trading performance, OTA's limited surveys indicated that most of its students did not trade or lost money when they traded, and TradeStation (the online trading platform used by OTA students) confirmed such indications. *See*, *infra*, at Fraudulent Concealment. OTA intended consumers to rely on its representations of earnings because it intentionally failed to disclose that it did not track students' trading performance or the results from its limited surveys or TradeStation reports. Consumers reasonably relied on OTA's representations of earnings when they purchased OTA training given the specific nature of the examples and seemingly

honest testimonials. Consumers were harmed because each paid up to tens of thousands of dollars for OTA training that failed to materialize into the substantial income that OTA advertised and expanded on at the sales events. Consumers' reliance on OTA's representations of substantial earnings were a substantial factor in causing them to lose money.

### 6.   Fraudulent Concealment

68.   In addition to OTA's deceptive advertising campaign and misleading sales events, OTA fraudulently concealed certain information from consumers. This information was material because it would have put consumers on notice of OTA's false representations regarding its strategies and success stories.

### a.   OTA Did Not Monitor Students' Trading Performance

69.   First, OTA fraudulently concealed the fact that it did not monitor the trading performance of its students. Additionally, OTA lacked data that would permit it to predict the trading performance of its students. OTA's Vice President of Admissions, Keeley Hubbard, testified to these facts:

(a)   "[I]t's impossible for us to get to exactly how well is every one of our students doing . . . [W]e don't have that data, and there's no way for us to collect it."

(b)   "There wasn't any formal way of tracking that whenever I was with the company, other than initiatives or efforts to get testimonials from students."

(c)   "Q. . . . [W]ere there any efforts at tracking on the long-term how students were performing in the markets? A: Not that I'm aware of when I was there. From my understanding, there was a survey conducted after I left. I believe it was in June of [2018]."

//
//

### b.     OTA's Limited Surveys Suggest Most Students Did Not Earn Income Through Trading

70.     Second, OTA fraudulently concealed the fact that its limited surveys indicated its students were not earning the income that it mass advertised. The first OTA survey about students' trading performance was conducted in mid-2018 and asked, "As a result of your experience at Online Trading Academy, would you say you're 'making money' through trading and investing?" The results were 66% of respondents stated that they were making no money and 31% were making "a little money[.]" Among members of OTA's Mastermind Community, who obtain the most extensive training and support, 58% of respondents said they were making no money.

71.     Illustrative examples of students' comments provided in response to the first survey are as follows:

(a)     "I have not been successful yet at all. I have lost a considerable amount of money, I cannot pay back all of my OTA loans that have come due[.]"

(b)      "There has been absolutely NO SUCCESS. This has been the WORST financial investment I have ever made. I have invested close to $100,000.00 in OTA (Mastermind, Courses, 3 weeks of travel, 3 weeks away from my practice, and 3 weeks of hiring a substitute Dr. to see my patients). The customer service is POOR. The Student Care Reps in KC are too busy to take my questions, and they have even skipped out on planned meetings. When I try to call with questions, they complain about being too busy. I have tons of questions, but nobody to turn to. I have yet to take a live trade."

(c)     "Lack of support at all from center. Student support is bad and not knowledge [*sic*]."

72.   The second OTA survey conducted shortly after the first survey had similar findings: A third of the respondents were not trading at all, and of those who did trade, less than 4% claimed they were "making lots of money." Of respondents who traded, over 23% stated that they were losing money and another 22% were making no money.

### c.   TradeStation Reports Confirm Most Students Did Not Earn Income Through Trading

73.   Third, OTA fraudulently concealed that TradeStation reports confirmed OTA's training and strategy failed to work as advertised. TradeStation, an online brokerage platform that OTA recommends its students to use to deploy OTA's strategy and execute trades, has records of all accounts of OTA students. These records show that roughly half of the students never make a trade, and of those who trade, 74.9% lose money. Indeed, less than 5% of those who trade made over $10,000.

74.   All students who traded likely used TradeStation instead of another online brokerage platform given the August 2013 contract between OTA and TradeStation, whereby TradeStation provided its platform, accounts, and data to OTA for use in classrooms, and OTA agreed not to use any other platform but TradeStation in classes on equities, options, or futures. TradeStation's trading data therefore strongly indicates that most OTA students who trade do not make any money, and many lose money on top of the thousands of dollars they pay OTA.

### d.   Samuel Seiden's Admissions

75.   Defendant Samuel Seiden, the creator and most visible proponent of OTA's proprietary trading strategy, whose benefits and income generation potential are the main reason offered for consumers to purchase OTA training, admitted that OTA was "fraudulent business" when he briefly left the company in 2018.

76.   OTA's advertisements, including infomercials and advertisements, have prominently featured Seiden. OTA holds him out to consumers at seminars as

the "creat[or of] the patent" and "an impeccable master" of the strategy. Seiden is OTA's Chief Trading Strategist and has previously served in a number of other executive roles at OTA, in at least some of them reporting directly to Defendant Eyal Shahar.

77.   When Seiden briefly left OTA, a November 20, 2018 email to Keeley Hubbard, OTA's Vice President of Admissions, revealed that Seiden had a dispute about pay, a "decline in student success," "Unethical & Deceptive Sales Messaging," and hearing from students who were "struggling to pay monthly finance payment[s]". At the time, Seiden claimed to have "overwhelming proof of [OTA's] fraud" and noted, "I have seen 2 other companies in our industry be shut down by regulators within 24 hours for far less than what Eyal [Shahar] is allowing to happen through OTA. OTA has employees who worked at those firms." Seiden indicated that he received emails "every day" from consumers "that are losing money because of OTA." OTA transferred $500,000 to Seiden in December 2018. Shortly after that, Seiden returned to work at OTA. Through this email, Seiden, an OTA officer, admitted that OTA operates a fraudulent investment scheme to scam students.

### e.   Gag Provision in Refund Agreements

78.   To further conceal its fraudulent scheme, OTA endeavors to silence dissatisfied customers. Consumers who request refunds from OTA are met with with significant resistance. OTA will sometimes agree to issue a refund if a consumer threatens negative publicity or threatens to file a complaint with the Better Business Bureau or a law enforcement agency or lawsuit. OTA often conditions refunds on a standardized agreement that includes a broad non-disparagement provision, barring any negative statements or reviews about OTA or its employees, and even barring reports to law enforcement agencies. These form contracts are non-negotiable and have led consumers to believe they cannot report OTA's misconduct or coordinate with law enforcement agencies investigating OTA.

79.    In sum, OTA has fraudulently concealed from consumers that (1) it does not monitor students' trading performance, (2) its two surveys indicate that, after receiving OTA training, most of its students do not trade or do not earn money trading, (3) the online trading platform that its students use confirm the surveys' results, (4) one of its own senior executives has called the business fraudulent, and (5) it only agrees to provide refunds to dissatisfied consumers who agree to not disparage it.

80.    OTA was aware of these facts through the normal course of its business. OTA intentionally failed to disclose these facts that were known only to it because these facts involved its own business practices, executives, and communications. Consumers could not have discovered these facts and did not know these facts because they are not privy to OTA's business practices and information provided to OTA's executives. Nothing reflects that students should have known OTA's earning claims were tenuous and unsupported. OTA intended to deceive consumers by withholding these facts that would have better informed them about the success (or, in reality, failures) of OTA training. Had OTA disclosed these omitted facts, consumers likely would not have purchased OTA training. Consumers were harmed because each paid up to tens of thousands of dollars for training that failed to generate income and, in many instances, resulted in loss income. OTA's concealment of the aforementioned facts was a substantial factor in causing consumers' harm.

### E.    Estimated Consumer Losses

81.    Defendants have made in excess of $370 million from January 2014 to May 4, 2019. Over 90,000 consumers have paid money to OTA, with over 11,000 consumers paying more than $10,000, and some paying over $50,000. OTA's own customer surveys and customers' trading data confirm that most OTA customers do not generate the substantial earnings that OTA falsely advertises. Indeed, most make little or nothing at all, and a large number lose substantial amounts of money

in addition to the money they spent on OTA programs, courses, and/or membership.

## VII. ENROLLMENT AGREEMENT

### A.    Take It or Leave It Agreement with No Negotiations

82.    Like the standardized refund agreement that OTA used to inhibit customers' ability to post negative reviews about Defendants and their services according to a federal court's Preliminary Injunction (*see supra*), OTA used a ***standardized enrollment agreement*** to severely limit customers' rights vis-à-vis OTA. OTA purportedly asked consumers who decided to purchase its training to enter into this form Enrollment Agreement. OTA provided the Enrollment Agreement to consumers on a take-it-or-leave-it basis, and consumers could not engage in meaningful negotiations of the Agreement's terms because consumers are financially insecure individuals who were lured by OTA's false representations of getting rich quick. The Agreement is oppressive because there is no negotiation of contract terms between OTA and students.

83.    The first page of the Enrollment Agreement contains the student's contact information, the track and programs chosen, the tuition and payment details, and the education counselor's name and comments. The second and third pages contain the "Statement of Terms" in densely worded, single-spaced text.

### B.    Disclaimers in Agreement Contradict Representations in Real Life

84.    In absolute contrast to the representations made by Defendants in their advertising campaign and at their sales events, the Statement of Terms contains various disclaimers, such as:

(a)    "Online Trading Academy, its Education Counselors and Instructors are not Registered Broker/Dealers, Certified Financial Planners or Registered Investment Advisors and will not provide me with any advice as to the investment or trading choices or the management of my finances.";

(b)    "Moreover, I recognize and acknowledge that my performance depends upon my individual skills, time availability and dedication in the training program and use of the Community as well as other factors."; and

(c)    "I acknowledge that the Online Trading Academy training program and use of its products and services should not be construed as a recommendation or an offer to buy or sell any security or the suitability of any investment strategy."

85.    Not only are the disclaimers buried in the Statement of Terms, they directly contradict Defendants' extensive representations that OTA training would enable students to earn substantial income through online trading and to replicate the success of OTA's instructors— regardless of students' experience, skill, and amount of financial or time investment. These disclaimers fail to cure the impression of wealth created by Defendants' false misrepresentations made in the mass advertisement campaign and expanded upon at in-person sales events like the Preview Event and MTO event. The disclaimers are a surprise as they are at odds with Defendants' extensive and representations to students.

## C.   **Arbitration Provision**

86.    The third page of the Enrollment Agreement contains a purported arbitration and class action waiver provision. This provision is invalid and unenforceable for several reasons.

87.    *First,* like the refund agreement discussed in the Preliminary Injunction (*see supra*), OTA used this ***standardized arbitration and class waiver provision*** to dissuade customers from seeking legal recourse against OTA and to inhibit customers' ability to do so.

88.    *Second*, like the disclaimers described above, OTA buried the provision in the Statement of Terms. It does not appear on the same page as material information like the student's contact information, the track and programs chosen,

**CLASS ACTION COMPLAINT**         40

and the tuition and payment details, all of which are listed on the first page of the Enrollment Agreement.

89.     *Third*, Defendants Shahar and Seiden are not parties to the Enrollment Agreement. The arbitration and class waiver provision does not cover their respective independent comments made in their respective individual capacities to consumers and students.

90.     *Fourth*, the provision purportedly **"*outlines what is expected of both of us*"** (emphasis added). Despite this mutual obligation, in some Enrollment Agreements, there is no signature line for the student or OTA after the Statement of Terms (only a signature line for the student in the middle of the first page, which does not set forth the Statement of Terms at all). In other Enrollment Agreements, there is only a signature line for the student at the end of the Terms of Statement on the third page—there is no signature line for OTA despite that the provision "outlines what is expected of both of us[.]" The provision is therefore a surprise because, in some instances, it does not require students and OTA to read and agree to it and, in other instances, when it appears at the end of a prolix printed form drafted by OTA, it purports to bind both parties but only has a signature line for the student.

91.     *Fifth*, the arbitration and class waiver provision covers "***all dispute, claim question or differences***" between students and OTA (emphasis added). The overbroad arbitration provision states, "I am giving up my right to litigation (or participate in as a party or class member) all disputes in court before a judge or jury." This language is incredibly broad so as to be substantively unconscionable.

92.     *Sixth*, the OTA enrollment process is highly questionable. Specifically, education counselors exert significant pressure on students to enroll in the MTO event at the end of the Preview Event and then to enroll in OTA packages before the end of the MTO event:

93.     Education counselors first contacted students before the MTO event and

**CLASS ACTION COMPLAINT**                                                           41

then have multiple one-on-one meetings with students during the three-day MTO event. Education counselors have the unfair advantage of access to students' questionnaire responses disclosing their assets, including real estate and retirement accounts, which they used to tailor their sales pitch. During the enrollment process at MTO events, education counselors have full knowledge of students' economic vulnerabilities. Education counselors are also able to take advantage of students' vulnerable state of mind—they were aware students were upset, frustrated, worried, nervous, and anxious when they come to the MTO lured by the promise of substantial income (*see supra*).

94.    In the one-on-one meetings, educational counselors attempt to close the sale of different packages of courses depending on students' assets. For example, education counselors pitch wealthier students the most expensive offering, "Mastermind," at $50,000 and pitch other students different packages with prices ranging from thousands to tens of thousands of dollars. Education counselors were aware of students' financial pressure points as a result of seeing their questionnaire responses beforehand.

95.    Education counselors exert economic duress on students by informing them that the prices offered are heavily discounted and that the discounts will not be available to those who wait until after the MTO to enroll. Students who still hesitate or balk may be offered "special" discounts to induce the student sign an Enrollment Agreement before leaving the MTO event. Students feel pressure and a sense of urgency to enroll in OTA training at or before the end of the MTO given OTA's extreme emphasis on the benefits of signing immediately and the consequences of delay.

96.    Given the education counselors' insistent demands that students quickly enter into the Enrollment Agreements, students had little or no opportunity to review the Statement of Terms, were not invited to ask questions about them, had little to no familiarity with what rights they were giving up with they signed (if they signed),

and were not informed that signing the arbitration and class waiver provision was optional or voluntary. OTA created a coercive environment for Plaintiffs and the Class to sign the Enrollment Agreements.

97. The Enrollment Agreement is therefore unenforceable between consumers and OTA and, in the alternative, between consumers and Defendants Shahar and Seiden.

## VIII. STATUTE OF LIMITATIONS

### A.   The Statute of Limitations Does Not Bar Plaintiffs' Claims

98. The statute of limitations did not begin to run because Plaintiffs did not and could not discover their claims. Plaintiffs and the Class had no knowledge of the fraud alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2020, the date the FTC filed a complaint with extensive allegations against Defendants for a permanent injunction and other equitable relief pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 57b, and the Consumer Review Fairness Act of 2016, 15 U.S.C. § 45b.

99. Plaintiffs and the Class are consumers that purchased programs, courses, and/or membership from OTA. Although they had direct contact and/or interaction with OTA, they had no means from which they could have discovered Defendants' deceptive business activities described in this Complaint before February 12, 2020. Indeed, Defendants represented to them that purchasers of OTA programs, courses, and/or membership were likely to earn substantial income by applying Defendants' patented trading strategy.

100. No information in the public domain was available to Plaintiffs and members of the Class concerning the conduct alleged herein prior to February 12, 2020, the date the FTC filed a complaint against Defendants. Plaintiffs and the members of the Class had no means of obtaining any facts or information concerning any aspect of Defendants' business activities given that Defendants are

private companies not required to disclose financial information to the public.

101.  For these reasons, the statute of limitations as to Plaintiffs and the Class' claims did not begin to run until, at the earliest, February 12, 2020.

### B.   Fraudulent Concealment Tolled the Statute of Limitations

102.  In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class. Plaintiffs and the Class did not discover, and could not discover through the exercise of reasonable diligence, Defendants' deceptive business activities until February 12, 2020, the date the FTC filed a complaint against Defendants.

103.  Before that time, Plaintiffs and the Class were unaware of Defendants' deceptive conduct and did not know before then that they were paying for useless programs, courses, and/or membership throughout the United States during the Class Period (defined *infra*). No information, actual or constructive, was ever made available to Plaintiffs and the Class that put Plaintiffs on notice that they were being injured by Defendants' deceptive conduct.

104.  The affirmative acts of Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

105.  Specifically, OTA made various misrepresentations to consumers, concealing the deceptiveness of its business practices. It represented to consumers that it had a patented strategy to time the market that anyone can apply to generate substantial profits through trading in stocks, foreign currencies, commodities, and other assets. Its instructors marketed OTA programs, courses, and/or membership to consumers in live seminars and held themselves out as converts and successful traders. Additionally, OTA made these representations despite not tracking the trading results of its students, despite its limited surveys revealing students were not making the amount of income OTA advertised, and despite trading data showed that most students do not make any money and lose money on top of the money they pay OTA.

106.  Furthermore, to conceal and preserve its scheme, OTA sought to silence dissatisfied consumers who sought a refund, requiring them to sign contracts barring them from posting negative reviews about OTA and from reporting OTA's wrongdoing—even to law enforcement.

107. Defendants concealed the deceptiveness of their business practices. OTA directed its presenters to use testimonials to create the impression that consumers can generate trading profits. OTA disseminated a "MTO Master Document" to MTO presenters that directed them to use testimonials, stating in bold, "Pinnacle on the testimonials for the wow factor," and noting "Key Loops" for this section of the presentation, including "Trading can replace or supplement my job" and "Trading can provide for retirement and wealth objectives." Furthermore, OTA stated that its programs, courses, and membership "is designed for students of all experience levels" and that it provided "a simple step-by-step, rule- based strategy" that will "consistently identify . . . quality trading and investing opportunities with a high degree of accuracy." Darren Kimoto informed students at a MTO event on March 21, 2019 that earning money with OTA's strategy is as easy as baking cookies: just follow the recipe.

108.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' business practices before February 12, 2020 at the earliest.

109.  Plaintiffs and the Class could not have discovered the alleged deceptive business practices at an earlier date by the exercise of reasonable diligence because of the deceptive practices employed by Defendants to fraudulently conceal that OTA's strategy did not work. OTA created the impression that consumers could use its strategy to earn money even if they did not have much time to devote to it or only had a small amount of money to invest at the start. OTA represented that the strategy "stack[s] odds in your favor" and that profits are a "mathematical certainty." OTA's presenters also hold themselves out as living proof that OTA's

products and strategy work, stating that they became successful traders and amassed substantial wealth using OTA's strategy.

110. Because OTA affirmatively concealed the nature of its products and outcome of its strategy, Plaintiffs and the Class had no knowledge of its deceptive business practices, or of any facts or information that would have caused a reasonably diligent person to investigate whether OTA was engaged in deceptive business practices, until, at the earliest, February 12, 2020, the date the FTC filed a complaint against Defendants.

111. For these reasons, the statute of limitations applicable to Plaintiffs and the Class' claims was tolled and did not begin to run until February 12, 2020.

## IX. CLASS ALLEGATIONS

112. Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

113. **Nationwide Class:** The proposed Class consists of all persons who purchased programs or courses of instruction from OTA in the United States from January 1, 2012 through such time as Defendants' unlawful conduct ceased. Excluded from the Class are Defendants, their affiliates, employees, officers, and directors, persons or entities that distribute or sell OTA products or programs, the judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

114. This action is properly brought as a class action under Federal Rule of Civil Procedure 23(a) for the following reasons:

(a) **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The proposed Class is so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable. While Plaintiffs do not know the exact number and identity of all

Class Members, Plaintiffs are informed and believe that there are thousands, if not tens or even hundreds of thousands of Class Members. The precise number of Class Members can be ascertained through discovery;

(b)     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the proposed Class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include, but are not limited to:

i.      Whether Defendants' conduct was unlawful, unfair or fraudulent;

ii.     Whether Defendants' advertising is likely to deceive the public;

iii.    Whether Defendants' conduct was false, misleading, or likely to deceive;

iv.     Whether Defendants breached their express warranty;

v.      Whether Defendants unjustly received funds from Plaintiffs and the Class;

vi.     Whether Defendants violated California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750;

vii.    Whether Defendants violated California's False Advertising Law, Cal. Civ. Code § 17500;

viii.   Whether Defendants violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

ix.     Whether Plaintiffs and the Class have been harmed and the proper measure of relief;

x.      Whether Plaintiffs and the Class are entitled to an award of punitive damages, attorneys' fees and expenses against

**CLASS ACTION COMPLAINT**                                                  47

Defendants; and

xi.   Whether, as a result of Defendants' misconduct, Plaintiffs and Class Members are entitled to equitable relief, and if so, the nature of such relief.

(c)   **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and the Class have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories;

(d)   **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other members of the Class, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

115.   This action is properly brought as a class action under Federal Rule of Civil Procedure 23(b) for the following reasons:

(a)   **Class Action Status (Fed. R. Civ. P. 23(b)(1)):** Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing  incompatible standards of conduct for Defendants. Class action status is also warranted under Rule  23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a  risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would  substantially

impair or impede their ability to protect their interests.

(b) **Declaratory and Injunctive Relief (Fed. R. C. P. 23(b)(2)):** Certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(c) **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

(d) The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion;

116. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

(b) This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered and

uniformity of decisions will be insured;

(c)     Without a class action, Class Members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

(d)     Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

117.    Defendants have, or have access to, address information for the Class Members, which may be used for the purpose of providing notice of the pendency of this class action.

118.    Plaintiffs seek damages and equitable relief on behalf of the Class on grounds generally applicable to the entire proposed Class.

119.    **Application of California Law:** California law should be applied to the nationwide Class because Defendants are located in California and have violated various California consumer protection laws. Indeed, application of California law is appropriate because Defendants' fraud emanates from California.

120.    Further, California law should apply to Plaintiffs and the Class' claims because all Defendants have their principal place of business in California; Defendants have conducted and maintained operations in California for several decades; Defendants developed their misrepresentations at OTA's corporate headquarters in Irvine, California; Defendants' misrepresentations were promulgated at various sales events throughout California, including at their headquarters; and the technical assistance for online courses and activities are available by calling a phone number with an Orange County area code. These facts present a sufficient nexus between California and the misrepresentations which form the basis of this Complaint. Furthermore, California has an interest in not only protecting its own consumers but in punishing businesses like Defendants that

**CLASS ACTION COMPLAINT**                                                50

operate within its borders and providing remedies to persons from other states for the torts of its businesses.

## X.    CAUSES OF ACTION AND CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Fraud Against All Defendants)

121. Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

122. As alleged herein, Defendants intentionally and falsely represented to Plaintiffs and Class Members that they would earn substantial income by purchasing OTA training; that OTA's various strategies would enable them to earn substantial income; that OTA instructors and education counselors were traders who could truthfully and accurately provide information regarding trading and counselors who could customize an education plan for them; that OTA instructors were successful traders; and that OTA's simulated trades were live trades even though they were not.

123. Defendants knew that their representations were false when they made them because OTA did not monitor its students' trading performance, OTA's limited surveys indicated that most of its students did not trade or lost money when they traded, and TradeStation confirmed such indications; OTA instructors and education counselors were merely salespeople whose objective was to enroll students in tracks and courses that cost thousands of dollars depending on their financial circumstances; OTA instructors were not successful traders and many of them had loss money or only broke even during a long-running bull market; and OTA instructors hand-picked easy and profitable trades to simulate before performing them.

124. Defendants intended consumers to rely on their representations of earnings because they intentionally failed to disclose that OTA did not track students' trading performance or the results from its limited surveys or TradeStation

reports; OTA intentionally provided its salespeople deceptive titles; OTA instructors and education counselors would point to instructors' success when students asked about how much they would make with OTA training; and OTA performed simulated, easy, profitable trade but held them out to be live trades in the financial market.

125. Plaintiffs and the Class reasonably relied on Defendants' representations of earnings when they purchased OTA training given the specific nature of OTA's examples and seemingly honest testimonials; OTA's frequent references to its patent, that the rewards outweighing the risks, and that the Daily Grid identifying all buy and sell opportunities for students; OTA instructors and education counselors' representations due to their purported titles; and OTA's simulated trades because consumers witnessed what they thought were live, successful trades.

126. Plaintiffs and the Class were harmed because each paid up to tens of thousands of dollars for OTA training that failed to materialize into the substantial income that Defendants advertised and expanded on at the sales events; for OTA strategies that failed to work; and for OTA training that did not adequately prepare consumers to trade profitably.

127. Plaintiffs and the Class' reliance on OTA's myriad and sundry representations was a substantial factor in causing their harm. Each OTA student paid up to tens of thousands of dollars for OTA training.

128. Furthermore, Defendants fraudulently concealed from Plaintiffs and the Class that OTA did not monitor students' trading performance; that OTA's two surveys indicate that, after receiving OTA training, most of its students do not trade or do not earn money trading; that the online trading platform that OTA students use confirm the surveys' results; that one of OTA's own senior executives has called the business fraudulent; and that OTA has only agreed to provide refunds to dissatisfied consumers who agree to not disparage it.

**CLASS ACTION COMPLAINT** 52

129.  Defendants were aware of these facts through the normal course of their business. Defendants intentionally failed to disclose these facts that were known only to them because these facts involved their own business practices, executives, and communications. Plaintiffs and the Class could not have discovered these facts and did not know these facts because they are not privy to OTA's business practices, information provided to OTA's executives, and communications between OTA and certain students. Nothing reflects that students should have known OTA's earning claims were tenuous and unsupported. OTA intended to deceive Plaintiffs and the Class by withholding these facts that would have better informed about the success of OTA training (or lack thereof). Had OTA disclosed these omitted facts, Plaintiffs and the Class likely would not have purchased OTA training. Plaintiffs and the Class were harmed because each paid up to tens of thousands of dollars for training that failed to generate income and, in many instances, resulted in loss income. OTA's concealment of the aforementioned facts was a substantial factor in causing Plaintiffs and the Class harm.

130.  As a proximate result of Defendants' misrepresentations and fraudulent concealment, Plaintiffs and Class Members were damaged in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Intentional Misrepresentation Against All Defendants)**

131.  Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

132.  As alleged herein, Defendants intentionally and falsely represented to Plaintiffs and Class Members that they would to earn substantial income by purchasing OTA training; that OTA's various strategies would enable them to earn substantial income; that OTA instructors and education counselors were traders who could truthfully and accurately provide information regarding trading and counselors who could customize an education plan for them; that OTA instructors

were successful traders; and that OTA's simulated trades were live trades even though they were not.

133.  Defendants knew that their representations were false when they made them because OTA did not monitor its students' trading performance, OTA's limited surveys indicated that most of its students did not trade or lost money when they traded, and TradeStation confirmed such indications; OTA instructors and education counselors were merely salespeople whose objective was to enroll students in tracks and courses that cost thousands of dollars depending on their financial circumstances; OTA instructors were not successful traders and many of them had loss money or only broke even during a long-running bull market; and OTA instructors hand-picked easy and profitable trades to simulate before performing them.

134. Defendants intended consumers to rely on their representations of earnings because they intentionally failed to disclose that OTA did not track students' trading performance or the results from its limited surveys or TradeStation reports; OTA intentionally gave its salespeople deceptive titles; OTA's instructors and education counselors would point to instructors' success when students asked about how much they would make with OTA training; and OTA performed simulated, easy, profitable trade but held them out to be live trades in the financial market.

135.  Plaintiffs and the Class reasonably relied on OTA's representations of earnings when they purchased OTA training given the specific nature of OTA's examples and seemingly honest testimonials; OTA's frequent references to its patent, that the rewards outweighing the risks, and that the Daily Grid identifying all buy and sell opportunities for Plaintiffs and the Class; OTA's instructors and education counselors' representations due to their purported titles; and on OTA's simulated trades because they witnessed what they thought were live, successful trades.

136. Plaintiffs and the Class were harmed because each paid up to tens of thousands of dollars for OTA training that failed to materialize into the substantial income that OTA advertised and expanded on at the sales events; for OTA strategies that failed to work; and for OTA training that did not adequately prepare them to trade profitably.

137. Plaintiffs and the Class' reliance on OTA's myriad and sundry representations was a substantial factor in causing their harm. Each OTA student paid up to tens of thousands of dollars for OTA training.

138. As a proximate result of Defendants' intentional misrepresentations, Plaintiffs and Class Members were damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### (Concealment Against All Defendants)

139. Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

140. Defendants fraudulently concealed from consumers that OTA does not monitor students' trading performance; that its two surveys indicate that, after receiving OTA training, most of its students do not trade or do not earn money trading; that the online trading platform that its students use confirm the surveys' results; that one of its own senior executives has called the business fraudulent; and that it has only agreed to provide refunds to dissatisfied consumers who agree to not disparage it.

141. Defendants were aware of these facts through the normal course of its business. Defendants intentionally failed to disclose these facts that were known only to them because these facts involved their own business practices, executives, and communications.

142. Plaintiffs and the Class could not have discovered these facts and did not know these facts because they are not privy to OTA's business practices, information provided to OTA's executives, and communications between OTA and

certain students. Nothing reflects that Plaintiffs and the Class should have known OTA's earning claims were tenuous and unsupported.

143.  OTA intended to deceive Plaintiffs and the Class by withholding these facts that would have better informed about the success of OTA training (or lack thereof). Had OTA disclosed these omitted facts, Plaintiffs and the Class likely would not have purchased OTA training. Plaintiffs and the Class were harmed because each paid up to tens of thousands of dollars for training that failed to generate income and, in many instances, resulted in loss income. OTA's concealment of the aforementioned facts was a substantial factor in causing Plaintiffs and the Class' harm.

144.  As a proximate result of Defendants' fraudulent concealment, Plaintiffs and Class Members were damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty Against Corporate Defendants)

145.  Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

146.  Defendants made numerous representations and promises to Plaintiffs and Class Members that they would be able to earn substantial income through OTA training.

147.  For example, Defendants' specific examples, student and instructor testimonials, and simulated trades gave students the impression that they could easily and quickly learn to make money online trading and replicate their instructors' purported successes.

148.  OTA training did not enable Plaintiffs and Class Members to earn substantial income and, in some cases, caused them to lose substantial money in trading.

149.  Defendants knew or should have known that their representations were false when they made them because OTA did not monitor its students' trading

performance, OTA's limited surveys indicated that most of its students did not trade or lost money when they traded, and TradeStation confirmed such indications; OTA instructors and education counselors were merely salespeople whose objective was to enroll students in tracks and courses that cost thousands of dollars depending on their financial circumstances; OTA instructors were not successful traders and many of them had loss money or only broke even during a long-running bull market; and OTA instructors hand-picked easy and profitable trades to simulate before performing them.

150. Plaintiffs and the Class reasonably relied on OTA's representations of earnings when they purchased OTA training given the specific nature of OTA's examples and seemingly honest testimonials; OTA's frequent references to its patent, that the rewards outweighing the risks, and that the Daily Grid identifying all buy and sell opportunities for consumers; OTA's instructors and education counselors' representations due to their purported titles; and on OTA's simulated trades because they witnessed what they thought were live, successful trades.

151. Plaintiffs and Class Members were harmed as a result and by the failure of OTA training to adequately prepare Plaintiffs and Class Members to trade profitably.

152. As a direct and proximate cause of Defendants' representations, promises, and warranties, Plaintiffs and the Class suffered significant damages and seek the relief described below.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)

153. Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

154. A party cannot induce, accept or encourage another to furnish or render something of value to such party and avoid payment for the value received.

155. As a result of the conduct describe above, Defendants have been, and

1    will continue to be, unjustly enriched at the expense of Plaintiffs and the Class.

2    156. Defendants have received, and are holding, funds belonging to
3    Plaintiffs and the Class which in equity Defendants should not be permitted to keep
4    but should be required to refund to Plaintiffs and Class Members.

5                          **SIXTH CAUSE OF ACTION**
     **(Violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et***
6                     ***seq.*, Against All Defendants)**

7    157. Plaintiffs re-allege and incorporate by reference the allegations
8    contained in the entirety of this Complaint as if fully set forth herein.

9    158. This cause of action arises under the Consumers Legal Remedies Act
10   ("CLRA"), California Civil Code §§ 1750, *et seq.* Plaintiffs and the Class are
11   consumers as defined by California § 1761(d). Defendants' seminars constitute
12   "services" and/or "products" as defined by § 1761(a) and (b). At all times relevant
13   hereto, Defendants constituted "persons" as that term is defined in § 1761(c), and
14   Plaintiffs' and Class Members' purchases of OTA seminars constitute
15   "transactions," as that term is defined in § 1761(e).

16   159. Defendants violated and continues to violate the CLRA by engaging in
17   the following deceptive practices specifically proscribed by § 1770(a), in
18   transactions with Plaintiffs and Class Members that were intended to result or which
19   resulted in the sale or lease of goods or services to consumers:

20   160. In violation of § 1770(a)(5), Defendants' acts and practices constitute
21   misrepresentations that the seminars in question have characteristics, benefits, or
22   uses which they do not have;

23   161. In violation of § 1770(a)(7), Defendants misrepresented that the
24   seminars are of a particular standard, quality and/or grade, when they are of another;
25   and

26   162. In violation of § 1770(a)(9), Defendants advertised the seminars with
27   the intent not to sell them as advertised or represented.

28   163. Defendants' uniform representations as set forth more fully elsewhere

**CLASS ACTION COMPLAINT**                                                    58

in this Complaint were false, deceptive, and/or misleading and in violation of the CLRA.

164. Pursuant to § 1782, Plaintiffs notified OTA in writing by certified mail of the particular violations of § 1770 alleged herein and have demanded that OTA rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act (*see* **Ex. C**). Plaintiffs sent this notice by certified mail, return receipt requested, to OTA's principal place of business.

165. If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days after receipt of the § 1782 notice, Plaintiffs will amend this Complaint to seek actual, punitive, statutory, and all other relief available to Plaintiffs and the Class under Civil Code § 1780.

166. In addition, pursuant to § 1780(a)(2), Plaintiffs are entitled to, and therefore seek, a Court order enjoining the above-described wrongful acts and practices that violate § 1770.

167. Plaintiffs and the Class are also entitled to recover attorneys' fees, costs, expenses, and disbursements pursuant to §§ 1780 and 1781.

### SEVENTH CAUSE OF ACTION
### (Untrue and Misleading Advertising in Violation of Cal. Bus. & Prof. Code §17500 *et seq.* Against All Defendants)

168. Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

169. § 17500 prohibits various deceptive practices in connection with the dissemination in any manner of representations which are likely to deceive members of the public to purchase products and services, such as the OTA seminars

170. Defendants disseminated, through common advertising, untrue statements about OTA and its training, and Defendants knew or should have known that the training did not conform to the advertisements or representations regarding

the training. Defendants intended Plaintiffs and the Class to see the advertisements and numerous material misrepresentations as set forth more fully elsewhere in the Complaint. Plaintiffs and the Class relied upon the advertisements and misrepresentations to their detriment.

171. As a result of the foregoing, Plaintiffs and Class Members are entitled to injunctive and equitable relief and damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (Violations of Cal. Bus. and Prof. Code §§ 17200, *et seq.* Against All Defendants)

172. Plaintiffs re-allege and incorporate by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

173. California Business & Professions Code §§ 17200, *et seq.*, prohibits acts of unfair competition, which means and includes any "unlawful, unfair or fraudulent business act or practice" and any act prohibited by § 17500.

174. Defendants violated § 17200's prohibition against engaging in an "unlawful" business act or practice by, *inter alia*, making extensive misrepresentations about OTA training and its successes. Specifically, as set forth more fully elsewhere in this Complaint, Defendants intentionally and falsely represented to Plaintiffs and Class Members that they would earn substantial income by purchasing OTA training; that its various strategies would enable them to earn substantial income; that its instructors and education counselors were traders who could truthfully and accurately provide information regarding trading and counselors who could customize an education plan for them; that its instructors were successful traders, and that the simulated trades were live trades, in violation of California Civil Code §§ 1572 (actual fraud), 1573 (constructive fraud), 1709 and 1710 (deceit), 1750, *et seq.* (California Legal Remedies Act), California Business & Professions Code §§ 17500, *et seq.* (false advertising), and the common law.

175. Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts and practices.

176. Defendants violated California Business and Professions Code § 17200's prohibition against engaging in a "fraudulent" business act or practice by, *inter alia*, disseminating, through common advertising, untrue statements about OTA and the training it sells that have a tendency to mislead the public and making numerous common material misrepresentations with the intent to induce reliance by consumers to purchase OTA seminars. Specifically, through its nationwide advertising campaign and sales events in dozens of cities, Defendants advertised to consumers that they can earn substantial income through OTA training with its infallible strategies, successful instructors, and simple steps and tools—regardless of consumers' background, amount of financial investment, and amount of time investment. Furthermore, Defendants violated § 17200 by issuing misrepresentations and untrue statements at the OTA seminars.

177. The foregoing conduct also constitutes "unfair" business acts and practices within the meaning of § 17200. Defendants' practices offend public policy and are unethical, oppressive, unscrupulous, and violate the laws stated. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and Class Members. The gravity of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such conduct. There were also reasonably available alternatives to Defendants to further their business interests.

178. Plaintiffs and Class Members have suffered injury in fact and have lost money and/or property as a result of Defendants' unlawful, fraudulent, and unfair business practices and are therefore entitled to the relief available under §§ 17200, *et seq.*

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, as applicable, respectfully request that the Court enter judgment in their favor and against OTA, as follows:

1.     That the Court certify this action as a class action, proper and

**CLASS ACTION COMPLAINT**                                     61

maintainable pursuant to Federal Rule of Civil Procedure 23, declare Plaintiffs are the proper class representatives, and appoint Plaintiffs' Counsel as Class Counsel;

2. That the Court grant permanent injunctive relief barring OTA from engaging in the unlawful acts, omissions, and practices described herein;

3. That the Court award Plaintiffs and the Class all statutory damages, including, but not limited to, compensatory, consequential, and general damages in an amount to be determined at trial;

4. That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

5. That the Court award Plaintiffs and the Class all costs and expenses of the action, including reasonable attorneys' fees;

6. That the Court award pre- and post-judgment interest at the maximum legal rate;

7. That the Court grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

8. That the Court grant all such other relief as it deems just and proper.

## XII. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: April 20, 2020

*/s/ Joseph W. Cotchett*
Joseph W. Cotchett (SBN 36324)
Elizabeth T. Castillo (SBN 280502)
Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
jcotchett@cpmlegal.com
ecastillo@cpmlegal.com
azapala@cpmlegal.com

1    Kelly W. Weil (SBN 291398)
     **COTCHETT, PITRE & McCARTHY, LLP**
2    2716 Ocean Park Blvd., Suite 3088
     Santa Monica, CA 90405
3    Tel: (310) 392-2008
     Fax: (310) 392-0111
4    kweil@cpmlegal.com

5    *Counsel for Plaintiffs Amy Jine, Ana Biocini,*
     *and the Putative Class*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**                                    63